### MOORE v. NEW YORK LIFE INS. CO.
### No. 1488.

Circuit Court of Appeals, Tenth Circuit.
June 12, 1937.
Rehearing Denied Aug. 7, 1937.

H. A. Kiker, of Santa Fe, N. M. (Verdan A. Doggett, of Raton, N. M., and Manuel A. Sanchez, of Santa Fe, N. M., on the brief), for appellant.

John C. Watson, of Santa Fe, N. M. (Francis C. Wilson and John T. Watson, both of Santa Fe, N. M., on the brief), for appellee.

Before LEWIS, PHILLIPS, and BRATTON, Circuit Judges.

LEWIS, Circuit Judge.

Appellee filed its bill of complaint in the court below on August 23, 1935, seeking rescission and cancellation of its 14-year term policy of insurance issued to Walter W. Moore in the sum of $15,000 and naming his wife as beneficiary to whom it agreed to pay the amount named if the insured should die within 14 years from the date of the policy. The policy was dated and issued on September 5, 1933, and by its terms took effect on August 26, 1933, on which date application for the policy by Moore was made out by written answers put down by the hand of an examining physician. The questions propounded to the applicant were on a printed form. The insured died on May 20, 1935. He left his widow, the beneficiary, surviving to whom he was married in January, 1916, and they had lived together thereafter until his death. The policy states:

"This Contract is made in consideration of the application therefor and of the payment in advance of the sum of $252.45, the receipt of which is hereby acknowledged, constituting the first premium * * *."

A like sum was to be paid each year thereafter until fourteen such payments should be made. Another provision of the policy is this:

"This Policy and the application therefor, copy of which is attached hereto, constitute the entire contract."

As a basis for rescission and cancellation the bill of complaint charges:

"(d) That, in and by his said written application, the said Walter W. Moore, declared in substance and effect that he did not, at the time of said application, drink beer, wine, spirits or other intoxicants, in any frequency or quantity, and that he had not drunk them in the past in any greater frequency or quantity than an occasional drink, and that during the then last past five years he had not drunk any of them to excess; and declared further, in substance and effect, that he had never consulted a physician or practitioner for nor suffered from any ailment or disease of the intestines, or the eyes, and declar-

ed further, in substance and effect, that, within the then past five years he had not consulted, been examined by, nor been treated by, any physician or practitioner, except Dr. C. B. Elliott of Raton, New Mexico, in January, 1933, for influenza; and, in immediate connection with his said declarations, did make further declaration in these words: 'On behalf of myself and of every other person who shall have or claim any interest in any insurance made hereunder, I declare that I have carefully read .each and all of the above answers, that they are each written as made by me, and that each of them is full, complete and true, and agree that the Company believing them to be true shall rely and act upon them;' all of which declarations will appear by a reference to said Exhibit A;

"(c) That the said declarations were false in this: that in the past, and within five years next prior to the making of his said application, said Walter W. Moore, had used and drunk intoxicants to excess; that within five years next prior to the making of his said application, he had suffered from ailments or diseases of the eye, of the intestines, of the prostate gland and from an abscessed condition in the rectal region; and that within five years next prior to the making of his said application he had consulted, been examined by, and been treated by a physician or physicians for said disease or ailment of the prostate gland and for said abscessed condition in the rectal region; that the complainant did believe the said declarations to be true, and did rely upon their truth in issuing the said policy; and that the falsity of said declarations, as herein above alleged, was a fraud upon the complainant."

Appellant, defendant below, having answered, the cause went to final hearing. The court found the facts, stated its conclusions of law, and entered decree that the policy be rescinded and surrendered to the clerk of court for cancellation, and that the clerk pay to defendant or to her attorney the amount of premiums that had been paid by insured then on deposit in the registry of the court with interest, which had theretofore been tendered by the insurer.

No proof was introduced tending to support the charges of the bill that the insured had used intoxicants to excess at any time, nor that he had suffered any ailment or disease not stated in his application, or been treated by any physician or practitioner therefor, nor of the other charges, except treatment by Dr. Elliott for abscesses in the region of the rectum, and except the testimony of Dr. Smith that he treated insured for prostatitis, within five years prior to insured's application for the policy.

Dr. Elliott testified that the abscesses were not of any considerable seriousness but were purely a local condition; that the insured was engaged in the live stock business, was of large physique, and the rubbing of the saddle would cause them.

The District Judge, when he came to pass on the merits, found that the abscess condition was in the region of the rectum, not in the rectum; and that said abscesses were not of a serious nature but of minor importance and did not affect the general health of the insured. See Cooley's Briefs on Insurance (2d Ed.) Vol. 4, p. 3394 et seq. Moreover, counsel for appellee in objecting to an interrogatory propounded to a witness called for appellant said:

"No issue is made of his physical condition, but that this answer, or these answers which counsel is about to read, has no tendency to dispute the testimony of Dr. Smith, that he treated the insured during the periods from 1931 to 1932, 1933, for prostatitis, which is the only issue in the case."

There is then left for consideration, as just indicated, whether there is substantial, unequivocal and convincing evidence that insured in his application made false answers which did not disclose the fact, if it were a fact, that Walter W. Moore had prostatitis and that within the five years he had been treated for it by Dr. M. F. Smith.

The particular questions in the application relied on and the answers thereto are these:

"10. Have you ever consulted a physician or practitioner for any ailment or disease not included in your above answers?" Answer: "No."

Prostatitis was not specified in the ailments referred to in the above question.

"11. What physicians or practitioners, if any, not named above, have you consulted or been examined or treated by within the past five years?"

Answer: "Dr. C. B. Elliott, Raton, N. Mex. Jan. 1933. Influenza. 2 or 3 days. Recovery."

The name of Dr. M. F. Smith was not included in the answer.

The District Judge in finding the facts said:

"That the answers of said Walter W. Moore to questions ten and eleven (10 and 11) aforesaid, were not full, complete and true, and were knowingly false in this: * * * and that said Walter W. Moore had consulted and had been treated by Dr. M. F. Smith, a duly licensed physician of Raton, New Mexico, several times in August and September, and on October 31st, on December 1st, and on December 15th all in 1931, on March 1st, and on May 15th in 1932, and on March 1st, on March 15th, and on April 1st in 1933, for chronic prostatitis."

The substance of that finding is the sole basis set up in the bill and relied upon at the .trial in support of appellee's claim to right of rescission and cancellation of the policy. Dr. Smith was the only witness who testified that insured had prostatitis and had been treated for prostatitis. Both propositions were challenged by appellant. As to the first, the challenge was direct by testimony of competent physicians and surgeons that he did not have prostatitis; and as to the second, that Dr. Smith did not treat him for prostatitis, it was circumstantial.

Those issues of fact require careful examination of Dr. Smith's testimony. The first six questions propounded to him were the usual formal inquiries as to his qualifications as a physician and surgeon and that he was acquainted with Walter W. Moore during his lifetime. He was then asked:

"During the five-year period prior to August 26th, 1933, were you consulted professionally by Mr. Moore? A. Yes, sir. May I look at my notes?"

He was informed that he could do so. He had a book which he called his record in his hand and apparently consulted it. He was then asked:

"Will you please state the dates on which you were so consulted by Mr. Moore? A. August, 1931, five times; September, 1931, six times; October, 1931, eight times; December, 1931, nine times; and, March, 1932, there was consultation in May, 1932, and March, 1933, and April, 1933, I believe that is all."

He said Mr. Moore had an old chronic prostate condition for which he treated him. He used massage and electric heat.

"Q. Did you administer any medicine? A. Yes, sir, I generally give them medicine for that. I do give them medicine internally.

"Q. Was this condition cured at the date of your last treatment, April first, 1933? A. No, sir.

"Q. Did you advise the patient that it was cured? A. No, sir."

No questions were asked on direct as to the symptoms he found. On cross-examination Dr. Smith became much confused as to the dates on which he had treated Mr. Moore. He had testified in chief that he treated him five times in August, six times in September, eight times in October, and nine times in December, 1931. The court in its findings said that Dr. Smith had treated Mr. Moore several times in August and September, on October 31st, on December 1st, and December 15th, all in 1931. It is impossible to reach a definite conclusion as to approximately how many times he treated or claims to have treated Mr. Moore in all or in any month. During that inquiry in the beginning of his cross-examination he said:

"Well, I would have to bring down the daily record to give you the exact dates, the way I kept the account at that time."

A little later on inquiry about the number of treatments in August, 1931, he said:

"I will put down the first, tenth and fifteenth. I treat them every five days.

"Q. You have no record of the first? A. I have a record; I can surely produce it; it is in my daily record in my safe.

"Q. Have you looked it up, the record? A. This is the record here.

"Q. That is not in your safe, is it? A. No. .This is a perfect record. I have no exact detailed record. * * *

"Q. Now describe to the court, please sir, just the symptoms which he exhibited at that time. (August 1, 1931) A. They feel uncomfortable; they have a little discharge at times; they are not critically ill, just unhappy, those old prostates, have difficulty voiding, sometimes have to get up at night.

"Q. What do you mean by being unhappy? A. Mean that a man that cannot

hold his water in the usual manner is unhappy.

"Q. Now, you mean, a man suffering from chronic prostatitis has frequent urination? A. Get up at night; have difficulty in urination.

"Q. If you found the first day of August, 1931, that Walter W. Moore was suffering from old prostatitis it necessarily follows that he had been troubled with frequency of urination? A. Not necessarily, at all.

"Q. Well, had he? A. Those symptoms vary; in his particular case he was complaining of a sense of weight and discomfort in the region of his prostate.

"Q. Do you know anything about whether he suffered any difficulty in urination? A. No, he had no difficulty in urination.

"Q. Is there anything connected with urination when a man has chronic prostatitis except frequency and difficulty of voiding? A. This discharge annoys them.

"Q. Suffer any pain? A. It is not excruciating pain, it is uncomfortable.

"Q. Let us talk about Walter W. Moore,—did he suffer, do you know, from frequent urination? A. He did not.

"Q. No trouble of that sort? A. No. * * *

"Q. Now, Walter W. Moore had no disturbance with his power to retain the urine, wasn't called upon to urinate frequently either day or night? A. That phase wasn't bothering him.

"Q. What about his nervous condition? Any evidence of nervousness, neurasthenia? A. He didn't consult me for those conditions; he has this prostatitis.

"Q. You mean to say that neurasthenia is not one of the symptoms of chronic prostatitis? A. Those people are, chronic prostatitis will certainly make them nervous, neurotic.

"Q. You use the word neurotic, and I have used the word neurasthenia—do you consider them the same? A. Yes, in my opinion.

"Q. What about his sexual powers? A. That matter was not brought up. He was normal. I presume. He had no nervous symptoms. * * *

"Q. Did you find him on your examination the first day of August, 1931, to be depressed, mentally? A. No specially.

"Q. Apprehensive? A. No.

"Q. That is what a person suffering from neurasthenia would be? A. Mr. Moore wasn't nervous; he was a great, big cowboy, not given to nerves.

"Q. He had no sexual disturbances of any sort? A. He didn't admit any.

"Q. He had no difficulty with urination? A. Yes, he had at times. He had discharge. He had at times painful urination."

He was later asked:

"Q. Did you find a discharge in the case of Walter W. Moore? A. Yes, we did. That was his complaint when he first came in.

"Q. Did you at that time make a slide from this discharge? A. Yes, we always do.

"Q. After you made a slide, what did you do? A. In that sort of discharge, as a rule those organisms—

"Q. I want to know what you did. A. You give them a slide, send him home, for him to make his own and bring it in.

"Q. What did you do in this instance? A. I don't know.

"Q. You know you did do that? A. Yes, sir.

"Q. When did he bring it back? A. The next time he came in."

After stating more than once that Walter Moore came in on the first, tenth and fifteenth of August, he was asked:

"Q. From after the tenth day of August, Walter W. Moore didn't come again until the first day of September? A. Yes, sir, that is right.

"Q. On the fifteenth day of September he came again? When was the next time he came again? A. The 31st day of October.

"Q. Was there one after the 15th day of September? A. The 15th and 30th day of September. The 31st of October.

"Q. September first, the fifteenth and September 30th, is that correct? A. That is right.

"Q. Then October 31st? A. Yes, sir.

"Q. Then what next? A. The first of December, and the 15th of December.

"Q. December first and fifteenth? Then he didn't appear again until March, 1932? On what days did he come then? A. The first.

"Q. On the first day of March? A. Yes, sir.

"Q. When next? A. May 15th.

"Q. Then he didn't appear again until March, 1933, first and fifteenth? A. March, 1933, he was there the first and fifteenth, yes, sir.

"Q. Then the last item was the first of April, 1933? April 1st, 1933? A. Yes, sir."

Further on he stated Mr. Moore was in twice in August, 1931, and twice in September, 1931, "do you want me to go over that again?"

"Q. No, we are doing fine. Just a minute. He was in twice in August, 1931? A. Yes, sir.

"Q. He was in twice in September, 1931? A. Yes, sir.

"Q. And he was in how many times in October, 1931? A. Once.

"Q. Well, I have three times in August, 1931, the first, the tenth and the fifteenth, you just testified to awhile ago. A. He was in in August, four times in December, 1931."

Later on he was asked whether he didn't have some trouble with Mr. Moore about a charge that he made for a call at his office because of a fibroid tumor on Moore's right thigh before Moore went to Mayo's and had the tumor removed. That matter is set out in Moore's application in answer to the question as to whether he had ever undergone any surgical operation. It occurred in 1925. Dr. Smith denied that he had any trouble with Moore, but stated that Moore "made some trouble." He admitted he looked at the tumor. He denied that Mrs. Moore paid him $6.00 for that call and was then asked:

"Q. And thereafter, a few months, you sent him a bill for the same trip? A. I don't know anything about it.

"Q. And Walter W. Moore came up and stated to you that he had already paid you once, isn't that true? A. That is possible; we are always delighted to adjust such matters."

He was then asked if he hadn't recently written a letter to Mrs. Moore about a bill which he claimed Moore owed him. He answered that he had, and that he had sent bills to Mr. Moore for the same services long before he died, and that he also sent the bill to Mrs. Moore. The letter was read to him and he was asked:

"Q. That is your signature to the letter? A. Yes, sir.

"Q. Will you explain to the court why you wrote that letter? A. We wanted to get the bill settled, that is all.

"Q. What effect did that have on your testimony in this case? A. Nothing—I don't know why I was asked to come in here."

The letter was then put in evidence. It reads thus:

"M. F. Smith, M. D.
Raton, New Mexico

"Raton, New Mexico, May 6th, 1936.
"Mrs. Walter Moore,
Raton, New Mexico.

"Dear Mrs. Moore: There is an old account outstanding on Walter Moore for $47.00. We are very anxious to get this closed out, and due to the fact that Walter Moore's estate is in litigation, 'We have been asked to testify in a insurance suit.'

"Kindly let us hear from you within the next few days.
"Yours sincerely,
"M. F. Smith
"MFS:H    [Sgd.] M. F. S."

He was further interrogated and testified:

"Q. Doctor, there was no hope that Walter W. Moore would ever recover from that chronic prostatitis the last time you saw him? A. Those people get well—why don't they, if they are treated properly.

"Q. Did you so regard Walter W. Moore as being then well? A. Well, prostatitis is a pretty common thing, wouldn't draw any particular conclusion.

"Q. The last time you saw him, April first, 1935, (1933) was Walter W. Moore at that time cured of chronic prostatitis? A. He had an old prostatitis all through that time; he never got over it to my knowledge in his life, he would never recover, there would always be at all times thereafter when the prostate was examined, evidence of this trouble."

Dr. Smith admitted that someone called upon him probably a month or two after Mr. Moore's death and asked him if he had any record or file for treating Mr. Moore; that he kept no record of that call and wasn't really interested. He was asked if it was Mr. Peck of Denver, Investigator for the insurer, but he did not identify the caller by name or otherwise.

Again, it is uncertain what symptoms Dr. Smith discovered on which he based his diagnosis that Mr. Moore had chronic prostatitis or prostatitis. His first answer was not applied specifically to Mr. Moore. He said:

"They feel uncomfortable; they have a little discharge at times; they are not critically ill, just unhappy, those old prostates, have difficulty in voiding, sometimes they have to get up at night."

In explanation of what he meant by unhappy, he said: "Mean that a man that cannot hold his water in the usual manner is unhappy." Asked if Mr. Moore was suffering the first time he called because of old prostatitis it would necessarily follow that he had been troubled with frequency of urination, he answered: "Not necessarily at all." He was asked: "Well, had he?" "A. Those symptoms vary; in his particular case he was complaining of a sense of weight and discomfort in the region of his prostate." He was then asked if he knew whether Mr. Moore suffered any difficulty in urination. He answered: "No, he had no difficulty in urination." He was again asked if Walter Moore suffered from frequent urination. His answer: "He did not." "Q. No trouble of that sort?" "A. No." Asked again whether Walter Moore had any trouble with his power to retain his urine and whether he was called upon to urinate frequently either day or night, his answer was: "That phase wasn't bothering him." Later on he was asked: "He had no difficulty in urination?" "A. Yes, he had at times. He had at times, painful urination."

Dr. Smith was asked whether he found Mr. Moore to be nervous. His answer: "He had no nervous symptoms. * * * Mr. Moore wasn't nervous; he was a great big cowboy, not given to nerves." He was asked: "What about his sexual powers?" "A. That matter was not brought up. He was normal, I presume." He further said Mr. Moore didn't admit any sexual disturbances of any sort. Dr. Smith was asked: "Well what about metastic symptoms, anything of that sort?" "A. There was nothing of that sort in his condition." His attention was called to several well known writers on prostatitis, among them Dr. Kretschmer of Rush Medical College. He conceded Dr. Kretschmer to be competent authority. The book named the symptoms (as read into the record)

under the following headings: (1) urinary; (2) sexual; (3) nervous; (4) metastatic. Dr. Rife of Santa Fe, New Mexico, was called as an expert. He gave the most common symptoms as frequent urination. Other symptoms given were painful defecation, nervousness, occasionally discharge from the penis, interference with the sexual powers, and feeling of fullness in the region of the rectum.

It cannot be said with confidence that Dr. Smith found any of the symptoms named by Drs. Kretschmer and Rife. Most of them he expressly eliminated. When he came to tell of his use of a slide he seemed to be in doubt as to just what he did in that respect. He said: "I don't know."

Dr. Elliott of Raton testified that he was consulted by Walter Moore in December, 1928, for an abscessed condition in the region of the rectum. He again saw him in April, May, June and July of 1930 for the same trouble. That matter was mentioned supra. He did not see Moore professionally after 1930 until 1934 when he treated him again. He said:

"I never had any indication at any time when treating Walter W. Moore that he was afflicted with prostatitis of any sort. I was never consulted by him concerning that. He was at all times until the latter part of 1934 a man whose appearance indicated robust health."

Dr. Whitcomb of Raton, New Mexico, was the examining physician who wrote down the answers to questions on Mr. Moore's application for the policy. As a witness he testified that he had practiced medicine in New Mexico for 25 years; that he was associated with Dr. Elliott; that during all that time he had been examiner for appellee company and other companies; that he examined Walter W. Moore on August 26, 1933, which was the date of his application and made the medical examiner's report; that he made a careful examination of Mr. Moore at that time; that all of the answers on the application were in his handwriting; that the answers on the medical report give the exact results of his personal examination of Mr. Moore at that time; that he attended him in the fall of 1934 for a little time; that he did not at that time or any other time discover that he suffered from chronic prostatitis or anything of that sort; that he did not inquire specifically as to

the prostate gland and made no examination for the purpose of determining whether he was suffering from prostatitis or infection of the prostate gland; that question wasn't asked in the examination.

Dr. Baker of Pueblo, Colorado, testified by deposition: that he was a regularly licensed physician in that state and had practiced in Pueblo since 1896, being a graduate of Northwestern University, Chicago, Medical Department; that on July 24, 1934, he examined Walter W. Moore of Raton, New Mexico, and made a general examination following the examination of his right eye by Dr. Hopkins, at Dr. Hopkins' request; that he found some bad teeth; pupil of his eye was dilated; blood pressure 130/80; lungs and heart appeared to be normal; abdomen was obese and flabby; no tumor masses could be made out; scrotum relaxed but normal; cremasteric abdominal reflexes present and active; he had no loss of sexual power; rectal examination showed presence of old scars due to old ischio rectal abscesses; knee jerks present and active; his prostate found to be normal; that there was nothing of a physical nature outside of the condition found by Dr. Hopkins that was a departure from normal. He also made a blood serum examination in regard to whether or not there was any syphilis, Wasserman and Kahn test. Both were negative, so there was no syphilis. Except for condition Dr. Hopkins found in the eye, his condition was very good. Moore was six feet all, weighing about 212 pounds.

Dr. Rife, a physician and surgeon of Santa Fe, was called and testified that in his judgment chronic cases of prostatitis are never entirely cured; that you can quiet them down for a time, but they don't stay that way very long unless you do something rather radical to eliminate the trouble.

Mrs. Moore, appellant, testified that she and her husband lived together continuously from January, 1916, until his death on May 20, 1935; that until the latter part of the year 1934 he was never seriously ill at any time; that in 1925 he had a fatty tumor removed from his right thigh at the Mayo clinic. Before going there he saw practically all the doctors in Raton, among them Dr. Smith. Some difficulty arose about the bill for that visit, and they paid it at the time. It was $6.00. Later Dr. Smith sent a bill for that $6.00. After that time so far as she knew no member of the family ever consulted Dr. Smith professionally. She never knew anything of her husband going to Dr. Smith in the years 1931, 1932 and 1933 for any kind of treatment. Prior to the time her husband had trouble with his eye in 1934 he slept well. She slept near him. He had no trouble with frequency of urination either day or night. He was never nervous. He made no complaint in the years 1931, 1932 and 1933 of any trouble with his kidneys or prostate gland. The first she ever heard from Dr. Smith with reference to treatments given Walter W. Moore was in the letter put in evidence in this case. She never saw any statements given by Dr. Smith to her husband for any attention after the year 1925. She had gone through the papers left by her husband and looked at bills, but found no bill from Dr. Smith. Until her husband developed trouble with his right eye in the year 1934 she had no knowledge of any physical infirmity on his part.

Dr. Smith's letter of May 6, 1936, to Mrs. Moore is an enigma. We see no connection between his statement that he had an old account against Walter Moore for $47 and his subsequent statement, "We have been asked to testify in an insurance suit." He was asked to explain that letter, why he wrote it. His answer: "We wanted to get the bill settled, that is all." Then he said: "I don't know why I was asked to come in here," although before making that answer he said he had known for a long time he would be called "as a witness in this case." Moreover, he took the witness chair with his claimed record in his hand and at once turned to it. Can it be that his letter carried a veiled threat to Mrs. Moore that he would testify against her in this case if she didn't pay him $47.-00? Discredited, as the witness was, by his letter of May 6, 1936, to Mrs. Moore, self-contradicted many times as to material facts, we cannot with any degree of confidence rest our conclusion on his testimony. Rather, we believe, the issues instead of being sustained by the appellee, were disproved by appellant.

Let the decree in favor of appellee be reversed with directions to vacate it and dismiss the bill at cost of appellee.